UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)

| | |
|---|---|
| In re<br><br>    SANDRINE'S LIMITED LIABILITY<br>    COMPANY,<br><br>              Debtor. | Chapter 11<br>Case No. 14-_____ |

**AFFIDAVIT OF GWYNETH B. TROST, MANAGER OF SANDRINE'S LIMITED
LIABILITY COMPANY, IN SUPPORT OF FIRST-DAY PLEADINGS**

GWYNETH B. TROST, being duly sworn, declares as follows:

    1.    I am the Manager of Sandrine's Limited Liability Company, the chapter 11 debtor and debtor-in-possession herein (the "Debtor"). My current responsibilities as Manager include overseeing all of the Debtor's business operations and financial affairs including, but not limited to, the formulation and implementation of business plans and strategies. I have been actively involved in the negotiation and implementation of the Debtor's financial restructuring activities, as well as providing advice concerning the management of the Debtor's assets. I have general knowledge of the Debtor's books and records, and I am generally familiar with the Debtor's financial and operational affairs. I have been associated with the Debtor's business since its formation in 1996. I am authorized to submit this Affidavit on behalf of the Debtor.

    2.    As a result of my first-hand knowledge of the Debtor's financial affairs, and through my review of the Debtor's books and records, I believe that the relief sought in the "first-day" motions and applications is necessary to enable the Debtor to continue to operate effectively as a debtor-in-possession following the commencement of its chapter 11 case. In my opinion, the

failure to obtain such relief would have a deleterious effect upon the Debtor's business and its ability to effectively reorganize or be sold as a going concern.

3. I submit this Affidavit in support of the Debtor's "first-day" motions and applications in the above-captioned chapter 11 case. Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth in this Affidavit.

4. Part I of this Affidavit describes the business of the Debtor and the developments that led to the filing of this chapter 11 petition. Part II sets forth the relevant facts in support of the various "first-day" motions and applications filed by the Debtor concurrently with this Affidavit.

## Factual Background

**A.    The Debtor's Business**

5. On December 10, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (Eastern Division).

6. The Debtor continues to act as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No Trustee has been appointed in these proceedings. No Creditors' Committee has been formed.

7. The Debtor operates its restaurant business at 8 Holyoke Street, Cambridge, Massachusetts. The Debtor is a corporation duly formed and existing under the laws of the Commonwealth of Massachusetts.

8. The Debtor was formed as a limited liability company under the laws of the Commonwealth of Massachusetts on August 26, 1996. The original members and managers were Stephen Batzell, Raymond Ost and Gwyneth B. Trost. The Debtor opened as Sandrine's Bistro ("Sandrine's") on December 17, 1996. The current members and managers are Gwyneth B. Trost and Amy Nomejko.

9. The Debtor's restaurant was the creation of French Master Chef, Raymond Ost. Chef Ost was the Chef of Le Meridien, Boston, which housed the acclaimed Julien Restaurant. His traditional French cooking with an Alsatian twist was a new concept in Boston. Chef Ost continued and expanded that legacy at Sandrine's. As a result, Sandrine's won many accolades and awards during its first six years of operations.

10. Over the course of the next six years, the restaurant experienced rapid growth and changes to its business model and position in the local restaurant scene. Located in historic Harvard Square, Cambridge, Sandrine's had become a mainstay among "Harvardites" and other locals. Maison Robert had recently closed, leaving Sandrine's the only authentic French restaurant in the Boston area. Online media evolved, gaining prominence, and leading to the new model of online reservation systems. The Debtor continued to adapt to this changing environment.

**B.    Circumstances Leading to the Chapter 11 Filing**

11. More recently, the Debtor experienced increasing struggles. Harvard Square had changed tremendously; the area surrounding Brattle and Church Streets, along with surrounding side streets, developed into a shopping and dining destination. New restaurants, including many regional and national chains, proliferated. The dynamic of exclusivity and elegance slowly gave way to mass market appeal and convenience.

12. The shifting focus of development, along with tourism and hotel trade moving customers away from the Holyoke Street region of the Square, eventually undermined the viability of many shops, restaurants and other establishments, including the Debtor.

13. At the same time, Chef Ost, having worked in the restaurant industry for decades, began to lose interest in Sandrine's. The restaurant slowly lost its reputation for innovation and leadership in the French cuisine for which it had become famous. The Debtor consequently began to experience declining revenue each year, culminating in a net loss of approximately $39,000 in 2013, and an estimated loss of more than $200,000 in projected for 2014. Recent healthy eating and dieting trends further eroded the Debtor's place in the Harvard Square cultural milieu.

14. Management realized that in order to preserve the value of the Debtor's business, a sale represented the best opportunity. The Debtor was approached by Pierre Honneger, owner of La Voile of Boston. Mr. Honneger was seeking to expand his restaurant concept to Cambridge. Sandrine's, with its well established location and remaining reputation for excellence, suited Mr. Honneger's needs perfectly.

15. Due to the Debtor's financial condition, it was determined that a sale of the business could best be accomplished through a chapter 11 bankruptcy proceeding. The Debtor's liabilities currently exceed its assets, and the Debtor had recently entered a cash-flow crisis. In order to remain operating during the negotiation of the sale and the administration of a chapter 11 proceeding, the Debtor need a rapid influx of funding. Without such funding, the Debtor would be unable to meet its payroll obligations, pay vendors, or continue to operate and thereby preserve its going concern value.

16.     The Debtor therefore entered into an agreement with Mr. Honneger to fund the Debtor's operations both prior to and during the bankruptcy filing.  Mr. Honneger, together with entities controlled by him, contributed funds as follows:

    a.    Pierre Honegger:    $143,043.76

    b.    Bato, Inc.:    $123,501.55

    c.    Chantal Rowat:    $88,690.82

Funding provided as of the Petition Date totaled approximately $355,236.13.  Mr. Honneger also committed to provide an additional $100,000 through a Court-approved debtor-in-possession loan facility (the "DIP Facility") pursuant to the DIP Financing Motion.

17.     The parties entered into a written Liquor License and Lease Purchase Agreement (the "Agreement"), whereby Bato Catering, Inc. (the "Purchaser"), agreed to purchase substantially all of the Debtor's assets for the following consideration:

    d.    cash at closing in the amount of $480,000 (the "Purchase Price");

    e.    waiver of the Purchaser's prepetition claims totaling at least $355,236.13; and

    f.    waiver of any repayment of the DIP Facility in the amount of $100,000.

The Debtor accordingly values the purchase price at least $580,000 (the cash portion together with the waiver of the DIP Facility amount), plus the value of the prepetition claim that is being waived.

C.  **The Debtor's Assets and Liabilities**

18.     As of the Petition Date, the book value of Debtor's assets totaled approximately $451,372.41, consisting primarily of: (a) inventory with a book value of approximately $25,397.76; (b) furniture, fixtures and equipment with a value of $250,477.20; (c) prepaid interest, marketing expenses and similar credits of approximately $65,895.83; (d) leasehold

5

interest in 8 Holyoke Street, Cambridge, Massachusetts, with an indeterminate value (the "Lease"); (e) 7-Day All Alcoholic Beverages Common Victualler License with an estimated value of approximately $120,000; and cash accounts with a currently negative balance of about $10,398.38. The Debtor does not believe the book value of its tangible and intangible assets is accurate; the fair market value of such assets, particularly at liquidation, would be substantially less. The Debtor is currently engaged in the process of obtaining an appraisal of its assets in order to present a more accurate figure for their fair market value.

19. According to the Debtor's records, its Petition Date liabilities totaled over $1.7 million, consisting of: (a) secured debt in the amount of approximately $253,000; (b) prepetition unsecured loans from the Purchaser in the amount of approximately $355,000; (c) trade debt in the aggregate amount of about $290,000; (d) wages and related employee compensation in the amount of approximately $24,000; (e) tax obligations, principally associated with wages and related employee compensation, totaling approximately $75,000; (f) unsecured loans from investors and others of approximately $720,000; and (g) other miscellaneous payables. Detailed schedules of assets and liabilities and a statement of financial affairs have been filed with the Bankruptcy Court pursuant to applicable rules of bankruptcy procedure.

20. Creditors asserting secured claims against estate include:

| Creditor | Lien Recording Date | Approximate Total Secured Portion of Claim |
|---|---|---|
| Cambridge Trust Company | 4/14/2006<br>8/2/2010<br>4/7/2011 | $104,780.01 |
| Corporation Service Company[1] | 11/21/2013 | $0.00 |
| Rewards Network Establishment | 11/22/2013 | $67,999.12 |

---

[1] The obligation to Corporation Service Company has been satisfied in full.

| | | |
|---|---|---|
| Services, Inc. | | |
| American Express Bank, FSB | 12/23/2013 | $29,156.01 |
| Marlin Business Bank | 4/24/2014 | $50,621.64 |
| Massachusetts Department of Revenue[2] | 3/17/2014<br>8/2/2014 | $0.00 |
| **TOTAL:** | | **$252,556.78** |

21.	Attached hereto as *Exhibit A* is a cash flow forecast and budget (the "Budget") covering the 8-week period through February 15, 2015 (the "Budget Period"). The Budget assumes that pending a sale of its assets, the Debtor will continue normal operations with financing provided by the Purchaser.

22.	After consultation with counsel and the Debtor's financial advisors, the Debtor authorized the commencement of this chapter 11 proceeding. The Debtor and I are confident that this chapter 11 case will enable Sandrine's to obtain financing necessary to continue its operations and to consummate the sale of its restaurant business, thereby maximizing the value of the Debtor's assets and the return to creditors of the estate.

### The First-Day Pleadings

23.	Contemporaneously with its petition, the Debtor filed the following pleadings (collectively, the "First-Day Pleadings"):

a.	*Motion for: (I) Approval of Sale Procedures; and (II) Entry of an Order Authorizing (A) Private Sale of Substantially All Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; and (B) Assumption and Assignment of Certain Executory Contract* (the "Sale Motion");

b.	*Debtor's Motion for Entry of Order: (I) Authorizing Debtor to Obtain Postpetition Financing; (II) Granting Liens, Security Interests and Superpriority Status; and (III) Scheduling Final Hearing* (the "DIP Financing Motion");

---

[2] The obligations to Massachusetts Department of Revenue underlying these liens have been satisfied in full.

7

    c.    *Debtor's Motion for Authority to Pay Priority Prepetition Wages and Salaries* (the "Wage Motion"); and

    d.    *Motion for Order Authorizing Debtor to Honor Gift Certificates in the Ordinary Course of Business* (the "Gift Certificate Motion").

24.    I believe that the relief sought by the Debtor in the First-Day Pleadings is necessary to enable the Debtor to continue to operate effectively as a debtor-in-possession and that the failure to grant such relief would undermine the Debtor's ability to administer its affairs under chapter 11. The factual background and support for each of the First-Day Pleadings is provided below.

**A.    The Sale Motion**

25.    As set forth above, the Debtor had entered into an agreement prior to the Petition Date to sell substantially all of its assets to the Purchaser. The Sale Motion filed concurrently herewith sets forth the terms and conditions of the sale. Absent a swift sale of the Debtor's business, the Debtor would be unable to sustain its operations. A forced liquidation of the Debtor's business would likely realize little to no value to creditors of the estate.

26.    As further described in the Sale Motion, the Debtor seeks to establish bidding and sale procedures that will allow the Debtor to close a sale to the Purchaser, or to another higher bidder should any such bidder emerge.

**B.    The DIP Financing Motion**

27.    The Debtor also filed contemporaneously herewith the DIP Financing Motion, which seeks entry of an interim order on an emergency basis (the "Interim Order") and thereafter a final order (the "Final Order" and, together, the "DIP Financing Orders") as follows:

    a.    authorizing, on an interim and permanent basis, the Debtor to:

        i.    obtain, postpetition financing in the form of a $100,000 debtor-in-possession credit facility (the "DIP Facility") pursuant to the terms

     of the written DIP Financing Agreement (the "DIP Financing Agreement") between the Debtor and Bato Catering, Inc. (the "DIP Lender"), a copy of which is attached to the DIP Financing Motion as *Exhibit A*;

   ii. grant to the DIP Lender security interests in and liens on substantially all of the Debtor's assets as security for the repayment of the DIP Facility

 b. approving the DIP Financing Agreement;

 c. authorizing, pursuant to the Interim Order, the Debtor to borrow funds under the DIP Facility and in accordance with the Budget, a copy of which is attached to the DIP Financing Motion as *Exhibit B*; and

 d. authorizing, pursuant to the Final Order, the Debtor to borrow funds on a permanent basis.

6. As set forth above, the Debtor is in critical need of immediate funding in order to continue its operations. Without such funding, the Debtor would not be able to pay its employees, vendors or other creditors. The Debtor would need to enter into a liquidation proceeding, resulting in the loss of any remaining value in the Debtor's business assets.

7. The Purchaser has already made prepetition loans to the Debtor totaling approximately $355,236.13. The Debtor anticipates the need for an additional $100,000 during the pendency of the sale process.

## C. The Wage Motion

28. Excluding the Managers of the Debtor, the company currently employs approximately 26 full-time and part-time employees (the "Employees"). Employees are compensated on a weekly basis. Additionally, many employees, including wait staff, are compensated by tips and other gratuities. The Debtor expects that current employee levels will remain substantially the same during the chapter 11 proceedings at least through the approval and closing of the contemplated sale.

29. Due to its challenging financial situation, the Debtor has been unable to fully pay all employee compensation for the payroll period ending on December 7, 2014, which would ordinarily be paid on December 9, 2014. Although checks were issued to all employees for the December 9th payroll, the Debtor does not believe that many of the checks have been negotiated yet with the Debtor's bank. According, the Debtor seeks authority to have the payroll checks honored postpetition to the extent they have not yet been negotiated. The Debtor's payroll liabilities, including employer tax and related obligations, as of the close of the payroll period just prior to the Petition Date totaled approximately $24,472.

30. To ensure that the Debtor is able to retain its valuable work force and allow Bato Catering, Inc., the proposed purchaser of its assets, (or another buyer) to continue operations post-sale (thus preserving many jobs), the Debtor seeks authority herein to pay and/or honor certain compensation that accrued prior to the Petition Date, including (but not limited to) any overtime wages, employee benefits, and taxes associated therewith (including the Tips defined below, the "Compensation"). Specifically, the Debtor seeks authorization to pay the Compensation that accrued: (i) during the two-week period from November 24, 2014, through and including December 7, 2014, and (ii) from December 8, 2014, through the Petition Date (i.e., the three-day period prior to the Petition Date).

31. Concurrently with this Motion, the Debtor filed the Wage Motion seeking authority to pay all outstanding Compensation. The Debtor's Employees, including highly trained chef and kitchen staff, sommelier, and others, are valued for their unique experience and contributions to the company's operations, culture, and distinctive profile in the restaurant industry. I believe that absent continuing payment of Compensation: (a) the Debtor would lose

valuable Employees due to attrition; and (b) the Debtor would be unable to quickly replace lost Employees with qualified, available and suitable candidates.

D. **The Gift Certificate Motion**

32. In the ordinary course of its business, the Debtor regularly sells Gift Certificates to its customers. Many of the Gift Certificates are given by the customers to their friends and family members. In 2014, the Debtor sold Gift Certificates totaling $10,523.93. During that same period, Gift Certificates sold in 2014 and prior years totaling $18,753.58 were redeemed. It is virtually impossible to determine the total outstanding Gift Certificates at any given point in time.

33. The Debtor has sought relief in the Gift Certificate Motion to honor the outstanding Gift Certificates in its sole and absolute discretion. I believe that any delay or refusal in honoring the Customer Programs, including the gift certificates, store credits, customer returns or special order deposits will severely and irreparably impair the Debtor's customer relations at a time when customer loyalty and patronage is critical. In my opinion, the continuation of the Customer Programs in the discretion of the Debtor is an absolute necessity for its continued operation and to the success of these chapter 11 proceedings.

Sworn under the pains and penalties of perjury this 10th day of December, 2014.

_____
Gwyneth B. Trost
Manager
Sandrine's Limited Liability Company